# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JUAN HERNANDEZ.

      Plaintiff,

  v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant.

Case No. 1:12-CV-00330-SMS

ORDER AFFIRMING AGENCY'S DENIAL
OF BENEFITS AND ORDERING
JUDGMENT FOR COMMISSIONER

      Plaintiff Juan Hernandez, proceeding *in forma pauperis*, by his attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.  Following a review of the complete record and applicable law, this Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on proper legal standards.

I.    **Administrative Record**

    A.    **Procedural History**

      Plaintiff previously applied for benefits pursuant to Title II of the Act at least four times.  On November 17, 2008, he filed this SSI application, alleging disability beginning February 11, 2002 and claiming that his back pain had increased significantly since his last prior application for

benefits.[1]  The Commissioner initially denied the claim on April 1, 2009, and upon reconsideration, on August 19, 2009.  On September 4, 2009, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a hearing on July 2, 2010.  On July 30, 2010, Administrative Law Judge Patricia Leary Flierl denied Plaintiff's application.  The Appeals Council denied review on December 6, 2011.  On March 2, 2012, Plaintiff filed a complaint seeking this Court's review.

**B.   Factual Record**

Plaintiff (born October 24, 1965) was a sanitation worker in a meat processing plant when he injured his back in February 2002.  After removing waste from beneath a conveyor belt, he slipped on a wet floor and fell, striking his back on a metal pipe.  Plaintiff's worker's compensation case was still pending when the ALJ conducted the SSI hearing in July 2010.  He received worker's compensation benefits and had not worked since the accident.

Plaintiff's application for benefits disclosed a history of felony convictions.  The record further discloses that Plaintiff had a history of smoking, alcoholism, and intravenous drug abuse (heroin).  He also took prescribed medications for back pain.

Plaintiff testified that he stopped using heroin in 2008, when he was hospitalized for a variety of issues including gall bladder removal and a systemic staph infection that resulted in abscesses and lesions in his abdominal muscles and lungs.  Plaintiff continued to use marijuana and asserted that he could have secured a medical marijuana card from his physician.

Plaintiff testified that he continued to experience severe lower back pain that shot out from his right hip down his leg.  His buttocks and toes were numb: he was numb below the waist, including his genitalia.  Walking and standing exacerbated his pain.  He could sit about fifteen minutes before needing to move.  He needed to elevate his leg three or four times daily and to lay

---

[1]  When an applicant has one or more previous denials of applications for disability benefits, as Plaintiff does here, he or she generally must overcome a presumption of nondisability.  *Chavez v. Bowen*, 984 F.2d 691, 693 (9th Cir. 1988).  In his disability reports, Plaintiff repeatedly stated that he had no new physical or mental limitations and no changes in his daily activities since his prior application or report.  *See, e.g.,* AR 173; AR 182; AR 193; AR 195.  Indeed, Plaintiff provided medical records from periods before this application (*see* AR 731-AR 753) which describe his condition in a manner consistent with his current claims.  Although Plaintiff conceded that his physical condition was unchanged, Social Security Acquiescence Ruling ("SSR") 96-4(9) adopted the provisions of *Chavez* only to cases involving a subsequent disability claim with an unadjudicated period *arising under the same title of the Act* as the prior claim in which there has been a final administrative decision that the claimant is not disabled.  Since Plaintiff brought his prior claims pursuant to Title II of the Act, *Chavez* does not apply here.

down about twice a day.  Based on his ability to take out the trash, Plaintiff estimated that he could lift between five and ten pounds.  Plaintiff found bending difficult and used his cane to straighten back up.  He could not climb stairs.  Twisting and reaching above his head were painful.  Plaintiff sometimes experienced incontinence, but no longer wore a diaper as he had during his 2008 hospitalization.

Plaintiff had previously had physical therapy and epidural injections, neither of which relieved his pain.  He took medication, including Hydrocodone, Norco, and Soma, experiencing drowsiness as the only side effect.  Plaintiff's neurologist, Ali Najafi, M.D., had prescribed a cane; Plaintiff also used a walker borrowed from his mother.  He testified that he was waiting for a second back surgery since the first surgery had failed: he denied the ALJ's suggestion that the surgery failed because of his heroin addiction.

Plaintiff cooked for himself and cleaned up afterward.  His daughter did vacuuming and sweeping for him.  Plaintiff was able to care for his personal needs.

Plaintiff completed school through the ninth grade.  In addition to his work in the meat processing plant, Plaintiff had been employed rebuilding auto parts, and as a plumber, roofer, and laborer.

**Medical Treatment.**  On February 4, 2008, neurologist Yannis M. Stavropoulos, M.D., prepared an agreed neurological surgical consultation for Plaintiff's worker's compensation case. The opinion provides a summary of Plaintiff's treatment from his initial injury on February 14, 2002, when Plaintiff was diagnosed with a lumbar sprain and a contusion on his buttock.  See AR 581-AR 586.  Dr. Stavropoulos's review reflects that as early as 2003, Plaintiff's neurologist, Dr. Najafi, was advocating surgery, although the recommended procedure varied from time to time. The assorted medical records submitted in support of the case indicate that Plaintiff's complaints of numbness had been evaluated by EMG testing, which revealed nerve conduction in Plaintiff's lower extremities to be normal.  In the years immediately following his accident, Plaintiff's treatment was interrupted on several occasions by his incarceration.  With a few exceptions, Plaintiff's medical care consisted almost exclusively of treatment for his back pain provided through worker's compensation; his case had not been resolved by the time his SSI application was heard.

Dr. Stavropoulos's 2008 review of tests and imagery indicated progressive degenerative disk and facet joint disease at Plaintiff's low thoracic and lumbar spine.  He recommended decompressive surgery to address the spinal canal and foraminal stenosis from L3 to L5 even though Plaintiff's medical and social issues adversely affected the risks associated with anesthesia and surgery.  Dr. Stavropoulos believed that Dr. Najafi was not aware of Plaintiff's complete medical and social condition, and recommended that he be advised.

Radiologist Martin Rauch, M.D., opined that lumbar spine x-rays taken May 2, 2008, revealed "[d]egenerative changes with stable mild L3-4 subluxation deformity.  Mild scoliosis."  AR 579.

In a supplemental agreed neurological surgical consultation dated July 30, 2008, Dr. Stavropoulos agreed that Plaintiff was a "candidate for L3 to S1 decompressive laminectomy for the purpose of stabilizing and possibly improving the radicular nerve root irritation due to stenosis symptoms and signs," but he did not recommend surgery at that time.  AR 576.  Stavropoulos noted that there was an up-to-ten-percent chance of spinal instability following decompression surgery.

On October 12, 2008, Plaintiff went to the emergency room of St. Agnes Medical Center, complaining of back pain and reporting that he had run out of Vicodin four days earlier.  His examination revealed multiple serious health issues.  He was hospitalized from October 12 through November 29, 2008, for ailments including (1) sepsis with hypotension; (2) septic pulmonary emboli caused by Staphylococcus aureus; (3) cholecystitis and cholelithiasis; (4) anemia requiring blood transfusion; and (5) chronic back pain.  The hospital retained Plaintiff through the full course of intravenous antibiotics necessary to treat his staph infection since he was considered a poor risk for home treatment, in part due to his history of intravenous drug use.[2]  Plaintiff complained of lower back pain throughout his hospitalization.

On February 8, 2009, Steven Stoltz, M.D. performed a consultative internal medicine evaluation of Plaintiff.  Dr. Stoltz noted that Plaintiff's recent hospitalization complicated Plaintiff's

---

[2] Plaintiff reported that he last injected heroin two weeks before admission.

symptoms.  Nonetheless, examination of Plaintiff's lower extremities revealed that all motion was

within normal limits.  After he examined Plaintiff's back, Dr. Stoltz noted:

> In the seated position he had no back pain with knee extensions.  In the supine
> position he had negative straight leg raising signs.  Standing he had no direct
> spinal tenderness.  He had no kyphoscoliosis.  Forward flexion was 70 degrees.

AR 468.

Plaintiff's sensory neurology was intact, his reflexes were normal, and he exhibited good

muscle tone bilaterally with "good active motion."  His gait was within normal limits.  Objective

testing revealed back pain without any focal neurological findings.  Stoltz doubted that Plaintiff's

anticipated back surgery would successfully relieve his symptoms.  He summarized:

> Based on my observations and objective physical examination findings, the
> claimant can lift and carry 20 pounds occasionally and ten pounds frequently.
> The claimant can sit without restriction.  He can stand and walk two hours at one
> time without interruption and five to six hours total in an eight hour work day.  He
> does not require a cane to ambulate for most of the time.  He has no restrictions
> with the use of his hands or feet.  I would limit climbing of stairs, ramps, ladders
> and scaffolds to an occasional basis and other postural activities to a frequent but
> not continuous basis.

AR 470.

On February 11, 2009, Dr. Najafi prepared a worker's compensation report diagnosing

Plaintiff with lumbar displacement, lumbar radiculopathy, and lumbar stenosis.  Dr. Najafi noted that

Plaintiff demonstrated mild to moderate tenderness to palpation in the mid- to lower lumbar spine

region, significant limitation of the range of back motion, and negative straight leg raise.

Following Dr. Stavropolous's second opinion concurring in the decision to operate, Dr.

Najafi performed a pre-operative examination on March 19, 2009.  In his pre-operative report, Dr.

Najafi indicated that surgery was indicated by severe back pain radiating to bilateral buttocks, thighs,

and calves; inability to sit more than ten minutes; and inability to stand more than a half hour.  On

March 30, 2009, Dr. Najafi performed bilateral L4-L5 and L5-S1 foraminaectomy and medial

facetectomy for decompression of nerve roots, using intraoperative magnification for

microdissection and decompression of nerve roots and intraoperative fluoroscopy for localization. Plaintiff received physical therapy following surgery.

On March 30, 2009, agency medical consultant K. Vu, D.O., prepared a physical residual functional capacity assessment.   Dr. Vu opined that Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently; was able to sit, stand, or walk for six hours in an eight-hour workday; and could only occasionally stoop or climb ramps, stairs, ladders, ropes or scaffolds.  Dr. Vu did not give Dr. Stoltz's opinion substantial weight since his examination occurred before Plaintiff's back surgery, which was expected to relieve Plaintiff's back pain.  He noted that Dr. Stoltz had recommended a sedentary rating to reflect Plaintiff's subjective complaints of back pain. Dr. Vu also noted that, even before the surgery, Plaintiff had exhibited a normal gait and negative single leg raise.

On May 1, 2009, Dr. Najafi's examination revealed that Plaintiff's incision was well-healed and that Plaintiff had full strength throughout his lower extremities.

On May 12, 2009, the state agency referred Plaintiff's claim to the Cooperative Disability Investigations Unit, alleging possible malingering.  Agents questioned Plaintiff on June 22, 2009. Although a well-used cane and walker were present in Plaintiff's living room, the agents observed that Plaintiff initially walked with normal gait and station, but later limped and clutched at his back.

On June 8, 2009, Plaintiff complained to Dr. Najafi of continued mild-to-moderate back pain and opined that the surgery had not helped him.  He used a cane while walking and continued to take pain medication.  Radiologist Diana Artenian, M.D., evaluated x-rays and reported slight retrolistheisis of L3 on L4 and degenerative changes at L4-5 and L5-S1.

Neuroradiologist H. Tookoian, M.D., evaluated an MRI performed on Plaintiff on August 7, 2009.  Dr. Tookoian identified degenerative changes at L3-4, L4-5, and L5-S1 with prominent disc components with central stenosis, particularly at the L4-5 level.

On July 29, 2009, Plaintiff was transported to the St. Agnes emergency room by ambulance for hypertension and shortness of breath. He also complained of a sore throat and intermittent diarrhea. Doctors prescribed Vicodin and Soma.

On August 17, 2009, medical consultant C. Fracchia, M.D., completed a physical residual capacity assessment. He opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; sit, stand, and walk six hours in an eight-hour work day; and had unlimited ability to push and pull. Plaintiff should only occasionally climb, balance, stoop, kneel, crouch or crawl. Dr. Fracchia noted that, following his recent back surgery, Plaintiff was projected to have the residual functional capacity to perform light work on or before March 2010.

When Dr. Najarian examined Plaintiff on September 4, 2009, Plaintiff complained of constant and severe radiating back pain. He continued to experience lower extremity pain and numbness when standing or walking. Dr. Najarian diagnosed worsening radiculopathy due to recess stenosis and recommended total facetectomy to obtain adequate nerve root decompression, with instrumentation to stabilize the spine.

On October 1, 2009, Plaintiff was examined by pain specialist Berj T. Kalamkarian, M.D. Dr. Kalamkarian suggested treatment with epidural corticosteroids. On November 24, 2009, Dr. Kalamkarian administered an epidural injection.

On December 23, 2009, Plaintiff told Dr. Najafi that although his lower extremity pain and paresthesis had improved, he still experienced a significant level of lower back pain, lower extremity pain, and paresthesis. He reported decreased mobility when walking and difficulty bending. When he walked more than ten to twenty minutes, Plaintiff felt weak. His condition limited his ability to participate in social activities and activities of daily living.

Dr. Najafi's examination revealed full strength and no atrophy. Plaintiff's lumbosacral spine was tender to palpation, and its range of movement was diminished. Straight leg raise was positive bilaterally. The doctor recommended L4-S1 total facetectomy with decompression and fusion and stabilization with instrumentation. He recommended that Plaintiff use a wheelchair or a scooter.

On January 13, 2010, radiologist Diana Artenian, M.D., reviewed Plaintiff's lumbar x-rays, comparing them to x-rays from June 2009. She identified chronic degenerative disc changes and

facet arthropathy at L4-5 and L5-S1, and mild disc degeneration and slight retrolisthesis at L3-4, with no evidence of significant instability.

On January 14, 2010,[3] Dr. Stavropoulos prepared an agreed neurological surgical consultation for Plaintiff's worker's compensation case.  Plaintiff reported that his symptoms were similar to those he described in the initial consultation with Dr. Stavropoulos on February 4, 2008. Following his March 2009 surgery, Plaintiff experienced mild improvement of his right leg discomfort and increased endurance when walking.  He was able to walk two blocks to the grocery store and return home carrying one grocery bag.  When he returned home, however, Plaintiff reported moderate-to-severe midline back pain, slight pain and cramping in his posterior thigh and right calf, and numbness in the dorsum and sole of his right foot.  Plaintiff experienced no particular weakness other than the mild weakness of his right foot attributable to an unrelated 1978 accident.

Plaintiff told Dr. Stavropoulos that he no longer injected any drugs although he periodically inhaled drugs (an October 2009 drug screen had been positive for cannabis) and drank beer. Plaintiff took Norco and Soma, prescribed by Dr. Najafi, four to five times daily.  He remained unemployed.

Noting that Plaintiff had declined an opportunity to participate in a drug rehabilitation program, Dr. Stavropoulos opined that additional spinal surgery would be inadvisable in light of risks associated with performing such surgery on an IV-drug abuser with a history of multisystem septicemia and abscesses.  Dr. Stavropolous believed that Dr. Najafi was not aware of the true reasons for Plaintiff's 2008 hospitalization.  He added that MRI evidence suggested that Dr. Najafi had neither performed the surgery in the manner reported nor achieved the decompression that was the objective of that surgery.

Dr. Stavropoulos concluded that further surgery was not indicated.  He recommended that Plaintiff participate in a drug treatment program and arrange for regular medical care, including a thorough urologic exam to evaluate and treat the urologic aspects of his condition.   He added that prescription use of opioids is inappropriate when the patient shows evidence of illicit intravenous drug use.

---

[3] Although the letter is dated "2009," its contents reveal this to be a typographical error.

On March 5, 2010, Dr. Najafi advised the worker's compensation carrier that Plaintiff continued to complain of moderate-to-severe back and leg pain and to take pain medication without improvement. He concluded that Plaintiff's prior surgery had failed:

> The patient has failed lumbar laminectomy and foraminaectomy L4-5, L5-S1. There is spondylolisthesis at L3-L4 with stenosis at this level. There is significant multilevel facet arthropathy and disc herniation with recess stenosis.
>
> This patient will require redo decompression with total facetectomy and discectomy at multiple levels. This will have a high chance of instability because of requiring the removal of the remainder of the facet that is left after having had facetectomy at L4-5 and L5-S1. Therefore, instrumentation with interbody device placement is recommended. There is mild scoliosis with spondylolisthesis at L3-L4 with 3-4 mm slippage at this level which may increase the chance of instability and would require instrumentation and fusion at these levels.

AR 609.

On May 14, 2010, Plaintiff was treated for lumbar back pain and diabetic neuropathy in the emergency room of St. Agnes Hospital. He also complained of numbness in his penis and an untreated bladder infection. Doctors there prescribed Norco, Tylenol, and Soma. On May 19, 2010, Plaintiff returned to St. Agnes, where he received an injection for lumbago from surgeon George A. Alam.

On May 21, 2010, Dr. Najafi completed a physical capacities evaluation on a form apparently provided by Plaintiff's attorney. He opined that Plaintiff could sit for ten minutes, stand for thirty minutes, and walk one-half mile in an eight-hour work day. Plaintiff needed to alternate sitting and standing every ten minutes. Plaintiff could not lift or carry anything. He could perform simple grasping, fine manipulation and feeling with both hands, but could not push or pull arm controls. He could not use his feet for any repetitive movements and could never bend, squat, crawl, climb, kneel, or stoop. Plaintiff was totally restricted from extreme heat and cold, vibrations, and hazards such as heights or machinery, and was moderately restricted from wetness, humidity, noise, fumes, odors, dust, gases, and poor ventilation. He had no visual limitations. Dr. Najafi did not

9

complete questions asking for the onset dates of the physical restrictions nor did he provide any comment on the functional limitations in the space provided.  He opined that without additional surgery, Plaintiff's prognosis was poor.  If Plaintiff received the additional surgery that Dr. Najafi recommended, however, he would recover in six to twelve months.

On two occasions in May and June 2010, Plaintiff was treated for urge incontinence at Clinica Sierra Vista, which prescribed medication.

**Vocational expert testimony.**  Vocational expert Judith Najarian testified that Plaintiff's prior work was properly classified as industrial cleaner, medium, two.  His prior jobs as a painter and roofer were both classified as construction worker II, very heavy, two.  All prior work was unskilled.

## II.    Discussion

### A.    Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determined physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, or work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

Step one:    Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:    Does the claimant have a "severe" impairment?  If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three:     Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:      Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:      Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of November 17, 2008.  His severe impairment was low back pain secondary to disc displacement with stenosis and radiculopathy.  The impairment did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.925 and 416.926).  Plaintiff was able to perform the full range of sedentary work.  He was not able to perform any of his past relevant work.  The ALJ applied the Medical-Vocational Guidelines. 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grids"), which directed a finding that Plaintiff was not disabled.

## B.    Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

In weighing evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  The Court must uphold the ALJ's determination that a claimant is not disabled if the ALJ applied the proper legal

1   standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary*

2   *of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole

3   can support either outcome, we may not substitute our judgment for the ALJ's."  *Key v. Heckler*, 754

4   F.2d 1545, 1549 (9th Cir. 1985).

5           **C.**     **ALJ's Failure to Adopt Dr. Najafi's Opinion**

6         Concluding that Dr. Najafi rendered the opinion "for apparent purposes of this application,"

7   the ALJ gave little weight Dr. Najafi's May 2010 opinion of Plaintiff's residual functional capacity,

8   noting that no other treating or examining physician rendered any opinion that Plaintiff was disabled

9   or even had significant limitations.  AR 17.  The ALJ gave significant weight to Dr. Stoltz's opinion,

10  which she found was "most consistent with the medical evidence."  AR 18.  Plaintiff appeals,

11  arguing that the ALJ failed to articulate specific and legitimate reasons for rejecting Dr. Najafi's

12  opinion.  The Court disagrees.  In many pages, the hearing decision set forth in detail both the

13  medical evidence supporting the ALJ's finding of a serious impairment and her analysis of Plaintiff's

14  testimony, objective medical evidence, and expert medical opinion relating to Plaintiff's residual

15  functional capacity.  Review of the ALJ's full analysis of Plaintiff's impairment and residual

16  functional capacity provides substantial support for the ALJ's rejection of Dr. Najafi's opinion.

17        **Plaintiff's credibility.**  Before considering medical opinion, the ALJ found that although

18  Plaintiff's reported symptoms were consistent with objective medical evidence, his reports of the

19  extent of his limitations were not fully credible.  An ALJ is not "required to believe every allegation

20  of disabling pain" or other non-exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir.

21  2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  "[T]he ALJ must identify what

22  testimony is not credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d

23  at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir.

24  1988).  He or she must set forth specific reasons for rejecting the claim, explaining why the

25  testimony is unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security*

26  *Administration*, 466 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently

27  specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's

28  testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between his testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The ALJ found that Plaintiff's claims of impairment were not fully consistent with objective medical evidence and his reported activities. She noted that Plaintiff complained of low back pain that radiated down his legs to his toes. Nonetheless, he reported that he was able to live alone, walk to the store, take out the trash, cook, wash dishes, and lift a gallon of milk.[4] He used a cane, and could walk on uneven surfaces without problems, but could not climb stairs. Plaintiff testified that he could walk two blocks, then rest three to five minutes; sit and stand for fifteen minutes; and lift five pounds. He elevated his legs three or four times daily for 20 to 30 minutes, and rested twice daily for one hour. Plaintiff testified that neither his physical not mental condition had changed since his prior application. According to medical records, Plaintiff had not seen his primary care physician between 2006 and the end of 2008.

---

[4] Although its precise weight varies depending on fat content, a gallon of milk weighs approximately 8.6 pounds. http://en.wikipedia.org/wiki/Gallon (July 24, 2013).

The ALJ added that in the course of their interview, CDI investigators had initially observed Plaintiff walking with a normal gait and station.  Plaintiff later limped and clutched at his back.  He did not use any physical assistance when he walked and sat in a chair for most of the interview.

**Expert medical opinions.**  Substantial evidence supported her determination to favor Dr. Stoltz's opinion.  As an examining physician, Dr. Stoltz, like treating physician Dr. Najafi, was among those experts whose medical opinions the Commissioner favors.  In addition, Dr. Stoltz opinion was a thoughtful and detailed narrative in contrast to the check-off form prepared by Dr. Najafi.

Physicians render two types of opinions in disability cases: (1) clinical medical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  "An ALJ is not bound by an expert medical opinion on the ultimate question of disability."  *Tomasetti*, 533 F.3d at 1041; S.S.R. 96-5p.

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] not treat[ed] the claimant (nonexamining physicians)."  *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nontreating physician.  *Id.*  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

14

Once a court has considered the source of the medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The ALJ may reject an *uncontradicted* opinion of a treating or examining physician only for clear and convincing reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.  Even though the treating physician's opinion is generally given greater weight, when it is contradicted by an examining physician's opinion that is supported by different clinical findings, the ALJ may resolve the conflict.

An ALJ must determine a claimant's residual functional capacity based on "all relevant evidence in the record."  *Valentine v. Commissioner of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.  Although an ALJ is not bound by uncontroverted opinions rendered by a plaintiff's physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear and convincing reasons for rejecting them.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  The ALJ must tie the objective factors of the record as a whole to the opinions and findings that he or she rejects.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

Plaintiff contends that the ALJ erred by favoring the opinion of Dr. Stoltz, an examining internist, over that of Dr. Najafi, the neurologist who performed Plaintiff's back surgery.  At AR 17-18, the ALJ carefully analyzed the various expert opinions regarding Plaintiff's residual functional capacity, including those of the non-examining agency physicians.  Plaintiff focuses only on the single paragraph in which the ALJ recounts the substance of Dr. Najafi's May 2010 opinion and states, "[T]he record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined until May 2010 for

apparent purposes of this application and is therefore given little weight." AR 17. The ALJ's full analysis of Plaintiff's physical condition and residual functional capacity spans about four typewritten pages, first including a detailed analysis of her conclusion that Plaintiff had a single severe impairment: "low back pain secondary to disc displacement with stenosis and radiculopathy." AR 14.

A complete reading of the hearing decision reveals that the ALJ favored the opinion of an examining physician, which (1) was detailed and explained the doctor's reasoning and conclusions, (2) was consistent with Plaintiff's medical record, and was consistent with the opinions of the nonexamining agency physicians, over the summary opinion of the treating physician, which (1) was prepared at the last minute, (2) lacked any explanation of the doctor's opinions. (3) presented restrictions with no apparent connection to Plaintiff's back condition, and (4) was uncorroborated by any other source.

In his written opinion, Dr. Stoltz acknowledged that Plaintiff had an over-six-year history of back problems with numerous imaging studies. AR 17. His objective testing of Plaintiff revealed pain without focal neurological findings. AR 17. Although an MRI revealed moderate degenerative disc disease, Plaintiff walked normally and had negative straight leg raising.[5] AR 17. Dr. Stoltz opined that Plaintiff generally did not need to use a cane and that the back surgery then being contemplated would not greatly improve Plaintiff's symptoms. AR 17-18. Dr. Stoltz opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk two hours at a time and five-to-six hours total in an eight-hour work day, and occasionally climb stairs, ramps ladders and scaffolds. AR 18. The ALJ acknowledged that the nonexamining agency physicians' opinions were generally consistent with that of Dr. Stoltz. AR17. (Note that both nonexamining physicians assumed that the surgery that Plaintiff had undergone since Dr. Stoltz

---

[5] The straight leg raising test is administered during a physical examination to determine whether a patient with low back pain has an underlying herniated disc. The test is positive if the patient experiences pain down the back of the leg when the leg is raised. *Miller v. Astrue*, 2010 WL 4942814 (E.D. Cal. Nov. 30, 2010) (No. 1:09-cv-1257-SKO).

examined him would relieve the pain that caused Dr. Stoltz to conclude that Plaintiff had the residual

functional capacity for sedentary work, allowing Plaintiff to perform work at the light level.)

In contrast, in May 2010, Dr. Najafi opined that Plaintiff was moderately restricted from

activities involving wetness, humidity, noise, fumes, odors, dust, gases, and poor ventilation, and

totally restricted from those involving extreme heat or cold, hazardous machinery, and heights.  AR

17.  (Although the ALJ did not explicitly say so, many of these restrictions have no apparent relation

to the back pain for which Dr. Najafi treated Plaintiff.)  Dr. Najafi added that Plaintiff could not

bend, squat, crawl, climb, kneel, or stoop, and should avoid pushing or pulling arm controls.  AR 17.

He should never lift or carry.  AR 17.  According to Dr. Najafi, Plaintiff could sit for 10 minutes,

stand for 30 minutes, walk for one-half mile, and should alternate sitting and standing every ten

minutes.  AR 17.

Dr. Najafi's opinion was prepared on a "check-off" form, apparently provided by Plaintiff's

attorney.  AR 720-AR 724.  An ALJ may reject an opinion provided on a check-off form that does

not include an explanation of the physician's reasoning.  *See De Guzman v. Astrue*, 343 Fed. Appx.

201, 209 (9th Cir. 2009) (An ALJ is "free to reject check-off reports that do not contain any

explanation of the bases of their conclusions"); *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996)

("ALJ . . . permissibly rejected [psychological evaluation forms] because they were check-off reports

that did not contain any explanation of the bases of their conclusions).

**Rejection of Najafi's opinion as rendered to influence litigation.**  Noting that no other

treating or examining physician had concluded that Plaintiff was disabled or had the extensive

limitations that Dr. Najafi expressed in May 2010, the ALJ gave Dr. Najafi's opinion little weight.

She concluded that the opinion was prepared to bolster Plaintiff's SSI application.  Relying on

*Lester*, 81 F.3d at 832, Plaintiff contends that the ALJ erred in doing so.

"[Q]uestions of credibility and resolution of conflicts in the testimony are functions solely of

the Secretary."  *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (*quotations omitted*).  In *Saelee*,

the Court explained that its holding in *Lester* should not be interpreted to always bar an ALJ's

consideration of the reasons for a medical expert's opinion that the claimant is disabled.  The opinion

relied largely on *Burkhart v. Bowen*, in which the Ninth Circuit upheld as a "permissible credibility

determination"  an ALJ's finding a physician's opinion to lack credibility because it had been

solicited by the claimant's attorney.  856 F.2d 1335, 1339 (9th Cir. 1988).  Burkhart, a truck driver,

had alleged disability based on legal blindness.  *Id.* at 1338.  In May 1985, the physician opined, "I

do not see [claimant] returning to work anytime in the near future."  *Id.*  In June 1985, the same

doctor noted that with his eyeglasses, claimant had 20/20 vision in his right eye and 20/25 vision in

his left eye, and a "'[p]ast history of possible optic neuritis, now improved with good visual acuity at

present.'"  *Id.*

In *Lester*, the ALJ rejected the opinions of both the claimant's treating physician and the

examining psychologist, each of whom opined that the claimant was markedly limited in several

areas of functioning, in favor of the opinion of a nonexamining medical advisor.  *Id.* at 830.  The

Ninth Circuit Court's opinion emphasized that an ALJ cannot reject the opinion of a treating

physician or an examining physician, even if it is contradicted by another doctor, except for "specific

and legitimate reasons that are supported by substantial evidence in the record."  *Id.* at 830-31.

Because the ALJ rejected the opinions of the treating physician and examining psychologist based

only on a nonexamining physician's opinion and the ALJ's own speculation that the "other doctors

were misrepresenting the claimant's condition or were not qualified to evaluate it," the Ninth Circuit

determined that the ALJ erred.  *Id.* at 831.

In *Saelee*, the Ninth Circuit clarified its decision in *Lester*.  The Court emphasized that the

ALJ had permissibly exercised his discretion in rejecting the diagnosis of the Ms. Saelee's treating

physician as untrustworthy since it was obtained solely for purposes of the administrative hearing.

94 F.3d at 522.  The Court noted that the hearing decision also found that the opinion was

inconsistent with the physician's own treatment notes and was worded ambiguously in an apparent attempt to assist the claimant. *Id.*

Critical to the Court's determination were the ALJ's findings that the treating physician himself noted his inability to identify any organic basis for the claimant's complaints and his reliance solely on the claimant's subjective complaints. *Id.* at 523. Put another way, "an ALJ may question the credibility of a treating physician where that physician's opinion letter had been solicited by the claimant's counsel *and* where the ALJ also presents other valid reasons (for example 'actual improprieties') for rejecting that physician's opinion." *Vasque v. Barnhart*, 2002 WL 1880743 at *6 n. 2 (N.D. Cal. Aug. 13, 2002) (No. C 01-01715 SC).

Consideration of the administrative decision in this case reveals that the ALJ tied her rejection of Dr. Najafi's opinion to substantial evidence in the record, particularly Dr. Stoltz's thoughtful and comprehensive evaluation of Plaintiff's medical condition and residual functional capacity following his review of Plaintiff's nearly six years of medical records, including imaging studies, and his physical examination of Plaintiff. Dr. Stoltz's opinions were consistent with other expert opinions of Plaintiff's residual functional capacity, while Dr. Najafi's opinion stood alone. That the ALJ also questioned the motivation for Dr. Najafi's perfunctory, last-minute opinion was justified in light of the record as a whole.

### D.   Determination that Plaintiff's Residual Functional Capacity is Sedentary Work

Plaintiff contends that, having given great weight to Dr. Stoltz's opinion, the ALJ improperly employed her own medical judgment to determine that Plaintiff was capable of performing sedentary work. Pointing out that the ALJ's determination in this case was not tantamount to her exercising independent medical judgment, the Commissioner responds that substantial evidence supported the finding that Plaintiff was capable of sedentary work.

This Court is baffled by Plaintiff's unsupported contention that, in determining a claimant's residual functional capacity, an ALJ is impermissibly interjecting his or her own medical opinion

unless he or she fully adopts the opinion of the expert physician to which he or she has given the most weight.  Remarkably, Plaintiff argues that since Dr. Stoltz and the nonexamining agency physicians opined that Plaintiff was capable of activities arguably better categorized as light work, a more rigorous level of activity than the sedentary level that the ALJ determined based on the record as a whole, this Court should reverse the ALJ's determination and remand for payment of benefits.

The cases that Plaintiff cites in support of his argument stand for nothing more than the general proposition that an ALJ may not impermissibly make his or her own medical judgment or interject his or her own medical opinion over those of the medical experts in the case.  *See Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975); *Sloan v. Astrue,* 2009 WL 5184426 at *4 (C.D. Cal. Dec. 21, 2009) (No. CV 08-07479-MAN). None of these cases addresses the process of analyzing a record as a whole to determine a claimant's residual functional capacity.  Nor did the claimant in any of these cases contend that the ALJ erred by underestimating his or her residual functional capacity.  In *Tackett*, the ALJ erred by rejecting significant and uncontradicted evidence of the claimant's nonexertional limitations and applying the medical-vocational guidelines (the "grids") rather than securing the testimony of a vocational expert to identify whether work that the claimant could perform existed in significant numbers.  180 F.3d at 1101.  In *Day*, the ALJ rejected, without comment, the uncontradicted opinions of the medical experts that the claimant's pain following an accident rendered her unfit for remunerative employment.  522 F.2d at 1155-56.  Instead, the ALJ substituted her own belief that Day was not disabled because (1) the medical experts were unable to identify the specific cause of her pain; (2) at the hearing, Day did not display certain physical manifestations of prolonged pain listed in a medical textbook; and (3) the ALJ's observation of Day at the hearing convinced him that she was capable of performing light work.  *Id.* at 1156.  Finally, in *Sloan*, the ALJ rejected the opinion of the claimant's treating physician and concluded, despite the absence of any such evidence in the record, that the

claimant was "capable of all types of work, except for jobs 'requiring frequent to continuing high-pressured negotiations with other people as a critical factor.'"  2009 WL 5184426 at *4.

In any event, although Dr. Stoltz opined that Plaintiff was capable of light work, agency physician Dr. Vu opined that finding that Plaintiff had a residual functional capacity to perform sedentary work was more appropriate than light work in that it acknowledged Plaintiff's subjective complaints of chronic low back pain.  Dr. Vu's opinion provides support for the ALJ's determination of a sedentary work level.

A social security disability appeal is not a game in which a claimant wins SSI benefits if he or she can successfully demonstrate that the ALJ made an error, especially an error that arguably determined that the claimant was more disabled than expert medical opinion indicated.  And even if this Court were to accept Plaintiff's argument that the ALJ erred by finding that claimant was capable of sedentary work when the ALJ had given the most weight to an opinion that the claimant had greater residual functional capacity and was capable of light work, the Court would not remand this case for payment of SSI benefits. The appropriate outcome in that instance would be to remand the case to the ALJ either for further findings supporting her conclusion that Plaintiff was capable of sedentary work or revised findings setting forth a conclusion that Plaintiff was capable of light work. Either way, such a remand would unnecessary waste the time and resources of the Court, the Commissioner, and Plaintiff himself.  Whether Plaintiff is capable of sedentary work or light work, he is not disabled.  20 C.F.R. Ch.3, Pt. 404, Subpt. P, Appx. 2, §§ 201.00 and 202.00.

## III.    Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court

///

///

hereby DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social

Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and

against Plaintiff.


IT IS SO ORDERED.


DATED:  8/7/2013                                    /s/ SANDRA M. SNYDER

                                                    UNITED STATES MAGISTRATE JUDGE